**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**


OHIC INSURANCE COMPANY,

             Plaintiff,                      Case No. 2:08-cv-83

        v.                            Judge Graham

EMPLOYERS REINSURANCE             Magistrate Judge Abel
CORPORATION,

             Defendant.


**OPINION AND ORDER**

I.   Introduction

In December 2007, plaintiff, OHIC Insurance Company ("OHIC"), filed suit in the Franklin County Court of Common Pleas against defendant Employers Reinsurance Corporation ("ERC"), now known as Westport Insurance Company. The complaint alleges that ERC breached a reinsurance contract, the Excess Cession Reinsurance Agreement dated January 1, 1994 (the "Reinsurance Agreement"), with OHIC (Count I), and breached its duty of good faith and fair dealing in handling a claim on the Reinsurance Agreement (Count II). This insurance coverage dispute between ERC and OHIC concerns the payment of statutory interest and legal expenses incurred in a 1998 Wisconsin medical malpractice lawsuit. The matter was removed to this court in January 2008.

Pursuant to a preliminary pretrial order and stipulated supplemental case management order of this court, the matter has been bifurcated into two phases. "Phase 1" of the litigation is

limited to the interpretation and construction of the Reinsurance Agreement and the policies of insurance that are reinsured by this agreement and/or constitute insurance for the underlying limits under this agreement. If a breach of contract is found to have occurred, OHIC's damages for the breach are to be decided in Phase 1, without prejudice to any of ERC's affirmative defenses or counterclaims to be decided in "Phase 2." OHIC's bad faith claim (Count II) is deferred until Phase 2. Also deferred to Phase 2 are all of ERC's affirmative defenses as set forth in paragraphs 33-36, and 39-40 of ERC's second amended answer to OHIC's complaint,[1] as well as all of ERC's counterclaims. The parties agreed that no argument concerning these affirmative defenses or counterclaims would be made or heard in Phase 1.

This matter is currently before the court on the parties' cross-motions for summary judgment concerning Phase 1 of this litigation. ERC moves for summary judgment as to all of OHIC's claims in Phase 1 of this case. OHIC has filed two partial motions for summary judgment: one on the issue of indemnification for prejudgment interest, and the other on the issue of indemnification for legal expenses and postjudgment interest. Also pending before this court is OHIC's motion for an order prohibiting testimony of a certain expert witness disclosed by ERC, and ERC's motion for leave to file sur-reply briefs to OHIC's reply briefs in support of its motions for summary judgment. The motions have been fully briefed by both parties, and are now ripe for disposition.

---

[1] ERC's affirmative defenses include allegations that OHIC failed to mitigate damages and that OHIC's claims are barred by the doctrines of waiver, estoppel, and unclean hands.

II.  Factual and Procedural Background

OHIC seeks reimbursement from ERC under the terms of the Reinsurance Agreement, which the parties entered in 1994.  Pursuant to the Reinsurance Agreement, ERC agreed to provide reinsurance for OHIC's excess liability policies becoming effective on or after January 1, 1994, and prior to January 1, 1998.  More particularly, ERC agreed to indemnify OHIC for certain "losses" and "claim expenses" sustained or incurred by OHIC.  Precisely what "losses" and "claim expenses" are covered by the Reinsurance Agreement is disputed by the parties.

In 1996, OHIC issued an insurance policy, Policy Number HPP-1996-4104-00 ("Primary Policy") to Children's Health Systems, Inc., the named insured, for the period of March 1, 1996, to March 1, 1997.  The Primary Policy generally has a $400,000 per occurrence limit of liability as to hospital professional liability, but as to insureds not covered under the Wisconsin Patients Compensation Fund, it has a $1 million per occurrence professional liability limit.  In addition to the applicable limit of liability, OHIC agreed to defend any suit against the insured seeking damages on account of injury, and to pay certain expenses and interest awarded in any suit defended by it under the policy.  Because it is not an excess liability policy, liability covered under the Primary Policy is not reinsured by ERC under the terms of the Reinsurance Agreement.

OHIC also issued Umbrella Liability Policy, Number UML-1996-4104-00 ("Umbrella Policy"), to Children's Health Systems, Inc., the named insured, for the period of March 1, 1996, to March 1, 1997.  The Umbrella Policy contains a $20 million coverage limit for each occurrence and names the Primary Policy in its schedule of

underlying insurance. The Umbrella Policy provides coverage for "ultimate net loss" in excess of the "retained limit." The retained limit includes the $1 million of hospital professional liability insurance provided under the Primary Policy for persons not subject to the Wisconsin Patients Compensation Fund. Thus, the Umbrella Policy provides coverage in excess of the limits of the Primary Policy. Because the Umbrella Policy became effective March 1, 1996, and because it provides excess liability coverage, it is reinsured by ERC under the Reinsurance Agreement.

In 1998, the Estate of Sarah Hegarty and her surviving parents sued various medical entities and two physicians in Milwaukee, Wisconsin, for negligently providing medical care to Hegarty in March 1996 at the Children's Hospital of Wisconsin. The case was captioned as <u>Estate of Sarah M. Hegarty, et al. v. Beauchaine, et al.</u>, Case No. 98-CV-009906. One of the physicians sued was Angela Beauchaine, M.D., an insured under the Primary Policy[2] and the Umbrella Policy. OHIC was also named as a defendant in its capacity as an insurer for Dr. Beauchaine.[3]

In July 2000, and pursuant to Wis. Stat. § 807.01(3), Hegarty's parents offered to settle their claims against Dr. Beauchaine for $3 million, and the Estate of Hegarty offered to settle its claims against Dr. Beauchaine for $349,999. These

---

[2] As determined by the trial court in <u>Hegarty</u>, Dr. Beauchaine was not covered by the Wisconsin Patients Compensation Fund. Thus, she was covered under the Primary Policy in the amount of $1 million for professional liability.

[3] Wis. Stat. § 632.24 permits a party to bring a direct action against an insurer for the negligence of the insured. <u>See</u> <u>Estate of Otto v. Physicians Ins. Co. of Wisconsin, Inc.</u>, 751 N.W.2d 805, 812-13 (Wis. 2008)(discussing Wis. Stat. § 632.24, Wisconsin's "direct action" statute).

offers of settlement were rejected.

The Hegarty case ultimately proceeded to trial in October 2004. The jury returned a verdict in favor of the plaintiffs. The jury found Dr. Beauchaine and Dr. Ernest Stremski negligent with respect to Sarah Hegarty's care and treatment, and that their negligence was the cause of Hegarty's injuries and death. The jury attributed 75% of the negligence to Dr. Beauchaine and 25% of the negligence to Dr. Stremski. The plaintiffs were awarded $12,557,947.29 in compensatory damages as to Dr. Beauchaine and OHIC. The trial court entered judgment against Dr. Beauchaine and OHIC, jointly and severally, and awarded to the plaintiffs the compensatory damages together with double taxable costs and statutory interest pursuant to Wis. Stat. § 807.01,[4] at an annual rate of 12%. Pursuant to the judgment, the statutory interest began to accrue on July 13, 2000, which was the date the plaintiffs served their offers of settlement, and would continue to accrue until the entire judgment was paid. On the date the jury entered its verdict, the amount of statutory interest that had accrued was $6,444,807.03, and on the date judgment was entered, it was $6,700,068.50.

The matter was appealed by OHIC, Dr. Beauchaine, and the plaintiffs, to a Wisconsin intermediate appellate court. See

---

[4] Wis. Stat. § 807.01(4) provides that when a defendant rejects a settlement offer made under this section, and the plaintiff ultimately recovers a judgment that is equal or greater than the amount of the settlement offer, the plaintiff is entitled to interest at an annual rate of 12% on the amount recovered. This statute, which is applicable to insurance companies that are sued directly under Wis. Stat. § 632.24, see Knoche v. Wisconsin Mut. Ins. Co., 556 N.W.2d 130 (Wis. App. 1989), will be more thoroughly discussed below.

Estate of Hegarty v. Beauchaine, 727 N.W.2d 857 (Wis. Ct. App. 2006). ERC and OHIC simply assert that the Wisconsin appellate court "affirmed" the decision of the trial court. While it is true that the Wisconsin appellate court affirmed many aspects of the trial court proceedings, it also reversed the trial court's judgment in part, and remanded the matter with directions. See id.

The Wisconsin appellate court resolved that it was error for the trial court not to order the production of a settlement agreement entered into before the start of trial between the plaintiffs and the settling defendants. See id. The court ordered the production of the settlement agreement, and remanded the matter with the instruction that the trial court address the issue of whether it had properly reduced the damage awards against Dr. Beauchaine and OHIC by 25%, in view of the terms of the settlement agreement.[5] See id. Therefore, the trial court's judgment as to damages was not fully resolved by the appellate decision, as the trial court was instructed to conduct further proceedings that potentially could have impacted the amount of damages awarded. Dr. Beauchaine and OHIC filed a petition for review of the intermediate appellate court decision, which was denied in March 2007 by the Supreme Court of Wisconsin. Estate of Hegarty v. Beauchaine, 732 N.W.2d 857 (Wis. 2007).

Even though it is unclear from the record before this court what occurred when the matter was remanded to the Wisconsin trial court for further proceedings as to the possible reduction of damages, based on the representations of the parties, the court

_____

[5] Under Wisconsin law, a settlement agreement may affect a plaintiff's recovery rights against non-settling defendants. See id.

finds that the amount of damages awarded was not altered.

Subsequent to the filing of the court of appeals decision, and during the pendency of the matter before the Wisconsin Supreme Court, OHIC and ERC entered a "Reservation of Rights/Interim Funding Agreement" ("Interim Agreement") to stop the continued accrual of interest, while also preserving the parties' respective legal positions. Pursuant to the Interim Agreement, the parties agreed that the total amount owed pursuant to the <u>Hegarty</u> judgment, as of December 6, 2006, would be deposited into a restricted, interest-bearing account. OHIC agreed to transfer the total amount owed to the restricted account.

As provided by the Interim Agreement, the amount deposited by OHIC into the restricted account totaled $22,238,893.87, which consisted of $12,557,947.29 in compensatory damages, $6,700,068.50 in "pre-judgment" interest awarded pursuant to Wis. Stat. § 807.01, and $2,980,878.08 in "post-judgment" interest. ERC agreed to pay a total of $13,048,386.33 to OHIC, which represented the entire amount awarded as compensatory damages minus the $1,000,000 retained limit covered by the Primary Policy ($11,557,947.29), combined with one-half of the "post-judgment" interest accrued as of December 6, 2006 ($1,490,439.04). ERC did not reimburse OHIC for the "pre-judgment" interest awarded pursuant to Wis. Stat. § 807.01. ERC reserved its right to seek recoupment of the amount it paid toward the "post-judgment" interest.[6]

III. Motion to Exclude Expert Testimony

---

[6] ERC asserts its alleged right to recoupment of the $1,490,439.04 via its counterclaim.

Before addressing the parties' motions for summary judgment, the court will address the pending motion to exclude expert testimony. Prior to the parties' filing of the motions for summary judgment, OHIC filed a motion in limine seeking an order prohibiting the testimony at trial of a witness whom ERC intends to call as an expert on Wisconsin law. Specifically, ERC has retained Thomas K. Mullins, a member of the bar of Wisconsin, to opine regarding the proper interpretation of Wis. Stat. § 807.01. OHIC seeks to exclude this testimony, and has not limited its motion to the proceedings in Phase 1 of this litigation.

OHIC argues that Mr. Mullin's opinions would be legal argument disguised as evidence, thereby invading the province of this court to decide the applicable legal standard for the jury. ERC argues that, if the presentation of expert testimony is necessary in this case, it should be permitted to present an expert opinion that rebuts the opinion of OHIC's retained expert, Dale Crawford, who is expected to testify regarding the nature and purpose of interest awarded under Wis. Stat. § 807.01. ERC contends that courts in various jurisdictions have permitted an expert to testify regarding the construction given to a law of a sister state. In support of this contention, ERC cites <u>Buzzone v. Hartford Acc. & Indem. Co.</u>, 125 A.2d 551, 557 (N.J. App. 1956), <u>aff'd</u>, 129 A.2d 561 (N.J. 1957); <u>Rice-Stix Dry Goods Co. v. Self</u>, 101 S.W.2d 132 (Tenn. 1935); <u>Union Cent. Life Ins. Co. v. Caldwell</u>, 58 S.W. 355 (Ark. 1900); and <u>Mowry v. Chase</u>, 100 Mass. 79 (Mass. 1868). Also, ERC requests that, should this court grant OHIC's motion regarding Mr. Mullin's opinions, the court should also exclude any opinions of OHIC's expert, Mr. Crawford, regarding Wis. Stat. § 807.01.

The court agrees with OHIC's argument that it would be

improper to allow testimony at trial of an attorney regarding Wisconsin law. Such testimony would invade the province of the court to resolve purely legal issues in dispute. The court also finds as unpersuasive ERC's reliance on state court cases to support its argument.

In <u>Lamar v. Micou</u>, 114 U.S. 218, 223 (1885), the United States Supreme Court stated that the "law of any State of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof." Recently, opinions of the Sixth Circuit Court of Appeals have "cabined" the concept of "judicial notice" to facts alone. <u>See</u> <u>U.S. v. Dedman</u>, 527 F.3d 577, 586-87 (2008). Nonetheless, the Sixth Circuit has recognized that, despite this shift in terminology, the court, not a jury, still determines applicable law, even when it is the law of other states. <u>Id.</u> When the law of a foreign nation is at issue, evidence may be presented regarding that issue. <u>See</u> Fed. R. Civ. P. 44.1 (setting forth the procedure for Federal courts to determine the law of a foreign country, and stating that such a determination "must be treated as a ruling on a question of law"). However, because Wisconsin is not a foreign state, its law must be determined by the court, without any testimony relating thereto.

Therefore, the court GRANTS OHIC's motion to exclude the testimony of ERC's expert (doc. 31). The court also GRANTS ERC's request to exclude any opinion of OHIC's expert, Mr. Crawford, regarding the proper interpretation of Wis. Stat. § 807.01. Accordingly, no party shall present expert testimony on the law of Wisconsin at any trial in this matter.

9

IV.  Summary Judgment Motions

   A.   Synopsis of Parties' Summary Judgment Motions

   By its motion for partial summary judgment on indemnification for prejudgment interest, OHIC argues that it is entitled to reimbursement from ERC for the prejudgment interest it paid under the Umbrella Policy in connection with the Hegarty case.  According to OHIC, this amount totaled $6,166,536.36, and is the amount of prejudgment interest that accrued on the compensatory damages covered by the Umbrella Policy.  OHIC argues that the "Supplementary Payments" provision of the Primary Policy only pays prejudgment interest on the amount of compensatory damages paid by the Primary Policy, and, therefore, the remainder of the prejudgment interest was paid under the Umbrella Policy and constitutes a "loss" under the Reinsurance Agreement.

   In its other motion for partial summary judgment, OHIC argues that the Reinsurance Agreement obligates ERC to indemnify it for legal expenses and postjudgment interest incurred by it in connection with the Hegarty case, based on a formula that applies the percentage share of the judgment paid by the Umbrella Policy to the total amount of legal expenses and postjudgment interest paid by OHIC under the Supplementary Payments provision of the Primary Policy.

   In moving for summary judgment as to Phase 1 of this litigation, ERC argues that, pursuant to the clear and express language of the Primary Policy, the Umbrella Policy, and the Reinsurance Agreement, it has no obligation to indemnify OHIC for any amounts attributable to legal expenses incurred in the Hegarty lawsuit or to the Hegarty court's imposition of interest pursuant to Wis. Stat. § 807.01.  ERC argues that the Umbrella Policy, which

is reinsured by ERC pursuant to the Reinsurance Agreement, does not provide coverage for the statutory interest or the legal expenses incurred by OHIC. According to ERC, the Primary Policy, which is not reinsured by ERC, provides coverage for the legal expenses and statutory interest.

Based on the parties' motions for summary judgment, it is clear that the following two issues are in dispute in Phase 1 of this litigation: (1) whether the "prejudgment" interest imposed pursuant to Wis. Stat. § 807.01 is covered by the Umbrella Policy and ultimately the Reinsurance Agreement, and (2) whether a portion of the "postjudgment" interest imposed pursuant to Wis. Stat. § 807.01, and the legal expenses incurred by OHIC in the defense of the <u>Hegarty</u> case, are covered by the Reinsurance Agreement.

B.    Summary Judgment Standard

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." <u>See</u> <u>Daugherty v. Sajar Plastics, Inc.</u>, 544 F.3d 696, 702 (6th Cir. 2008); <u>LaPointe v. United Autoworkers Local 600</u>, 8 F.3d 376, 378 (6th Cir. 1993). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case at issue, <u>LaPointe</u>, 8 F.3d at 378, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. <u>Walton v. Ford Motor Co.</u>, 424 F.3d 481, 485 (6th Cir. 2005); <u>Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.</u>, 12 F.3d 1382, 1389 (6th Cir.

1993). In response, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Thus, "[o]nly disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty, 544 F.3d at 702 (quoting Anderson, 477 U.S. at 248).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the

plaintiff." <u>Anderson</u>, 477 U.S. at 252; see <u>Dominquez v. Corr. Med. Servs.</u>, 555 F.3d 543, 549 (6th Cir. 2009).

C.    Choice of Law

In a diversity action, a district court must apply the choice of law rules of the state in which it sits. <u>Klaxon v. Stenton Electric Mfg. Co.</u>, 313 U.S. 487, 496 (1941); <u>National Union Fire Ins. Co. v. Watts</u>, 963 F.2d 148, 150 (6th Cir. 1992). Ohio choice of law rules mandate that the law of the state with the more significant relationship to a contract should govern disputes arising from it. <u>Watts</u>, at 150. In the case at bar, three insurance policies are at issue. For purposes of their respective motions for summary judgment, and responses thereto, the parties do not dispute that Ohio law governs the construction or interpretation of the Reinsurance Agreement, and Wisconsin law governs the construction or interpretation of the Primary Policy and the Umbrella Policy.

Under Ohio law, "[t]he construction of written contracts . . . is a matter of law." <u>Alexander v. Buckeye Pipe Line Co.</u>, 374 N.E.2d 146, paragraph one of the syllabus (Ohio 1978). When a court is confronted with an issue of contractual interpretation, the court must give effect to the intent of the parties to the agreement. <u>Westfield Ins. Co. v. Galatis</u>, 797 N.E.2d 1256, 1261 (Ohio 2003). The court must examine an insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy. <u>Cincinnati Ins. Co. v. CPS Holdings, Inc.</u>, 875 N.E.2d 31, 34 (Ohio 2007) (citing <u>Kelly v. Med. Life Ins. Co.</u>, 509 N.E.2d 411, paragraph one of the syllabus (Ohio 1987)); <u>See</u> <u>Stickel v. Excess In. Co. of Am.</u>, 23 N.E.2d 839 (Ohio

13

1939)("A contract of reinsurance, like any other contract, should be construed so as to give effect to the intention as expressed by the language of the parties.  It cannot be extended or enlarged by implication . . . and all of its provisions should be construed together in determining the meaning and intention of any particular clause or portion thereof.")

Contract terms are to be given their plain and ordinary meaning.  <u>Gomolka v. State Auto. Mut. Ins. Co.</u>, 436 N.E.2d 1347, 1348 (Ohio 1982); <u>Alexander</u>, 374 N.E.2d at paragraph two of the syllabus ("Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.").  Technical terms will be given their technical meaning, unless a different intention is clearly expressed.  <u>Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.</u>, 678 N.E.2d 519, 526 (Ohio 1997).

"A court will resort to extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning."  <u>Kelly</u>, 509 N.E.2d at 413.  Regarding the issue of whether a contract provision is ambiguous, OHIC observes that the Sixth Circuit, in <u>Lincoln Electric Co. v. St. Paul Fire & Marine Ins. Co.</u>, 210 F.3d 672 (6th Cir. 2000), a case involving the interpretation of a contract under Ohio law, stated in a footnote that "[e]xtrinsic evidence can become a consideration *before* an ambiguity has been identified from the face of the contract as a matter of law, in the limited sense that such evidence can assist

the court in determining whether, as a matter of law, two plausible interpretations exist in the manner necessary to give rise to the *existence* of an ambiguity." Id. at 684 n.12 (Emphasis sic)(citing an Eleventh Circuit decision applying Florida law, and an Eighth Circuit decision applying Missouri law). While the meaning of this statement is unclear, the Sixth Circuit has consistently recognized the well-settled principle that Ohio courts will not use extrinsic evidence to create an ambiguity. See e.g. Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 904 (6th Cir. 2006)(citing Covington v. Lucia, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003)); see also Schachner v. Blue Cross & Blue Shield of Ohio, 77 F.3d 889, 893 (6th Cir. 1996)("[I]n this circuit, before a district court can consider extrinsic evidence of the parties' intent, it must find an ambiguity on the face of the contract.") Galatis, 797 N.E.2d at 1261 (noting that it is well-settled Ohio law that when the language of a written contract is clear, an Ohio court may look no further than the writing itself to find the intent of the parties).

An ambiguous provision in an insurance policy is one that has more than one reasonable interpretation. Hacker v. Dickman, 661 N.E.2d 1005, 1006 (Ohio 1996). But a provision is not ambiguous solely because it could have been more clearly drafted. Milburn v. Allstate Ins. Co. Prop. & Cas., 2009 WL 3320557 (Ohio App. 10th Dist. Oct. 15, 2009)(citing Rucker v. Davis, 2003 WL 21404511 (Ohio App. 4th Dist. June 17, 2003)). "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." Galatis, 797 N.E.2d at 1261 (citing Gulf Ins. Co. v. Burns Motors, Inc., 22 S.W.3d 417, 423 (Tex. 2000)).

Wisconsin law, like the law in Ohio, provides that the interpretation of an insurance contract is a question of law.

<u>Plastics Eng'g Co. v. Liberty Mut. Ins. Co.</u>, 759 N.W.2d 613, 620 (Wis. 2009). An insurance policy is to be construed so as to give effect to the parties' intentions. In <u>Plastics Eng'g Co.</u>, the Wisconsin Supreme Court further explained: "The contract's words are to be given their common and ordinary meaning, and when the policy language is plain and unambiguous, we enforce the contract as written and without resorting to the rules of construction or principles from the case law." Thus, if a contract is unambiguous, "determin[ing] the parties' intent ends with the four corners of the contract, without consideration of extrinsic evidence." <u>Huml v. Vlazny</u>, 716 N.W.2d 807, 820 (Wisconsin 2006).

D.  Prejudgment Interest

With the above standards in mind, the court will first address the issue of whether the "prejudgment" interest imposed in the <u>Hegarty</u> case pursuant to Wis. Stat. § 807.01, that was calculated on the portion of the compensatory damages covered by the Umbrella Policy, is covered by the Reinsurance Agreement. The issue ultimately resolves to whether OHIC's payment of this interest constitutes a "loss" sustained by OHIC under the Reinsurance Agreement.

i.  Pertinent Statutory and Policy Language

Wis. Stat. § 807.01(4) provides as follows:

If there is an offer of settlement by a party under this section which is not accepted and the party recovers a judgment which is greater than or equal to the amount specified in the offer of settlement, the party is entitled to interest at the annual rate of 12% on the amount recovered from the date of the offer of settlement until the amount is paid. Interest under this section is in lieu of interest computed under §§ 814.04(4) and

815.05(8).[7]

Pursuant to the "SUPPLEMENTARY PAYMENTS" provision of the Primary Policy, OHIC agreed to pay, "in addition to the applicable limit of liability":

> (a) all expenses incurred by the company [OHIC], all costs taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon;
>
> . . .

(Doc. 39-4, p. 1.)

The Supplementary Payments provision of the Primary Policy was amended by endorsement to expressly include coverage for prejudgment interest. The endorsement states:

> The following is added to the Supplementary Payments provision in this policy:
>
> The Company [OHIC] will pay, in addition to the applicable limit of liability, prejudgment interest awarded against the insured on that part of the judgment the Company pays. If the Company makes an offer to pay the applicable limits of its liability, the Company will not pay any prejudgment interest based on that period of time after the offer.

(Doc. 39-4, at Bates Stamp OHIC00008240.)

Pursuant to the "COVERAGE" provision of the Umbrella Policy,

---

[7] Section 814.04 imposes postverdict interest at a rate of 12% per year until judgment is entered, and § 815.05 imposes postjudgment interest at a rate of 12% per year until the judgment is paid. These statutes apply to every judgment involving the recovery of money. See id. Thus, even when § 807.01(4) does not apply in a case involving a monetary award, statutory interest is still imposed postverdict, and then postjudgment, at a rate of 12% per year until the judgment is paid.

OHIC agreed:

> To indemnify the insured for ultimate net loss in excess
> of the retained limit which the insured shall become
> legally obligated to pay as damages because of personal
> injury, property damage or advertising liability to which
> this policy applies, caused by an occurrence.

(Doc. 39-5, at Bates Stamp ERCP 011855.)

The Umbrella Policy defines "ultimate net loss" as follows:

> "Ultimate net loss" means the sum actually paid or
> payable in cash in the settlement or satisfaction of any
> claim or suit for which the insured is liable either by
> adjudication or settlement with the written consent of
> the company, after making proper deduction for all
> recoveries and salvages collectible, but excludes all
> loss expenses and legal expenses (including attorneys'
> fees, court costs and interest on any judgment of [sic]
> award) and all salaries of employees and office expenses
> of the insured; the company or any underlying insurer so
> incurred.

(Doc. 39-5, at Bates Stamp ERCP 011857.)

"ARTICLE I" of the Reinsurance Agreement states as follows:

> <u>APPLICATION OF AGREEMENT.</u>  This agreement applies to the
> Commercial General Liability, Hospital Professional
> Liability, Automobile Liability, Non-Owned Aircraft
> Liability and Heliport Liability coverages under the
> REINSURED'S[8] excess liability policies written on an
> occurrence or a claims made basis to apply excess of
> underlying insurance which afford limits not less than
> the limits specified in the following Schedule of
> Underlying Limits as respects loss under policies
> becoming effective on or after the effective date and
> prior to the termination date of this agreement.

(Doc. 39-6, p. 1.)

"ARTICLE III" of the Reinsurance Agreement provides as
follows:

---

[8] The preamble of the Reinsurance Agreement labels OHIC as the
"REINSURED," and ERC as the "CORPORATION," for the purpose of the
agreement.

18

RETENTION AND REINSURANCE. As respects loss sustained by the REINSURED under such policies, the CORPORATION hereby agrees to indemnify the REINSURED against 100% of such loss subject to limits of $25,000,000 each occurrence, $25,000,000 annual aggregate except in the event that the underlying Hospital Professional Liability limit of $1,000,000/ $3,000,000 is self-insured, then the REINSURED shall retain as its own retention 90% of the first $1,000,000 each occurrence/$1,000,000 annual aggregate and the CORPORATION would indemnify the REINSURED against the remaining 10% of such $1,000,000 each occurrence/$1,000,000 annual aggregate and 100% of the $24,000,000 of loss each occurrence/$24,000,000 annual aggregate excess of $1,000,000 each occurrence/$1,000,000 annual aggregate.

(Doc. 39-6, Amendment No. 1.)

"ARTICLE IV" of the Reinsurance Agreement defines the terms "loss" and "claim expenses":

The word "loss" shall mean only such amounts:

(a) within applicable policy limits as are actually paid by the REINSURED in settlement of claims or in satisfaction of awards or judgments (including prejudgment interest and plaintiff's costs included in the judgment and subject with the judgment to the applicable policy limit);

. . .

[B]ut the word "loss" shall not include claim expenses.

. . .

The term "claim expenses" shall mean all payments under the supplementary payments provisions of the REINSURED'S policy, including court costs, interest upon judgments, and allocated investigation, adjustment, and legal expenses.

. . .

(Doc. 39-6, pp. 3-4.)

ii. Nature of Interest Imposed Under Wis. Stat. §

19

Pursuant to Wis. Stat. § 807.01(4), if the party making the settlement offer recovers a judgment which is greater than or equal to the amount of the settlement offer, that party is entitled to interest, at an annual rate of 12%, on the amount recovered, from the date of the offer until it is paid. The parties do not dispute that the amount of interest that accrued, from the date of the offer of settlement, until final judgment was entered by the trial court in the <u>Hegarty</u> case, totaled $6,700,068.50. In fact, the Interim Agreement reflects the parties' agreement that "$6,700,068.50 in pre-judgment interest [was] awarded pursuant to Wis. Stat. § 807.01[.]"

Despite what is reflected in the Interim Agreement, ERC, in responding to OHIC's motion for summary judgment as to prejudgment interest, argues that no part of the imposed statutory interest can be characterized as "prejudgment" interest. According to ERC, this statutory interest would be more appropriately characterized as "penalty" interest. In arguing that § 807.01(4) interest is not prejudgment interest, ERC describes the differences between interest imposed under § 807.01(4) and prejudgment interest that is imposed under Wisconsin common law.

ERC correctly notes that, under Wisconsin law, prejudgment interest on damages is generally limited to cases involving a reasonably certain standard of measurement for ascertaining the amount owed, <u>see</u> <u>Olguin v. Allstate Ins. Co.</u>, 237 N.W.2d 694, 698 (1976), and that this interest is calculated at the rate of 5% per year. <u>See</u> Wis. Stat. § 138.04 (setting legal rate of interest). ERC is also correct insofar as it asserts that interest imposed pursuant to § 807.01(4) is not entirely "prejudgment" or

"postjudgment" interest, and that the interest imposed under this section could be viewed as a penalty for not settling what is ultimately determined to be a valid claim. But, just as the statute could be viewed as a penalty for not settling a valid claim, it could be viewed as an incentive to settle before trial. These are two sides of the same coin. When an offer of settlement is made before trial, the resolution of the case remains uncertain, and both parties must evaluate the inherent risks of going to trial as it relates to their respective position. For the defendant, the risk of having to pay interest under § 807.01(4) is one of the many factors in that analysis. Additionally, § 807.01(4) imposes the same rate of interest as §§ 814.04 and 815.05, which impose postverdict and postjudgment interest in every case involving a monetary judgment.

While § 807.01(4) does not expressly distinguish between prejudgment and postjudgment interest, in substance it provides that interest accrues "from the date of the offer of settlement until the amount [recovered] is paid." Therefore, although interest imposed pursuant to § 807.01(4) is not confined to the prejudgment period, the amount of time used to calculate the interest includes time before the judgment, just as it includes time after the judgment. Hence, because a portion of the interest imposed under the statute is based on the amount of time from the date of the offer until the judgment, a distinct part of the interest awarded under that statute is "prejudgment" interest. See DeWitt Ross & Stevens, S.C. v. Galaxy Gaming and Racing Ltd. P'ship, 682 N.W.2d 839, 846 (Wis. 2004) (noting that § 807.01(4) provides for the imposition of prejudgment interest). For this reason, ERC's argument that § 807.01(4) does not impose prejudgment

interest is unpersuasive; the statute imposes both prejudgment and postjudgment interest.

      iii. Coverage of Prejudgment Interest Under Primary Policy

      a. Supplementary Payments Provision

OHIC argues that, pursuant to the "Supplementary Payments" provision of the Primary Policy, as amended by the prejudgment interest endorsement, the Primary Policy only provides coverage for the prejudgment interest awarded against the insured on the amount of the compensatory damages paid by the Primary Policy. Of the $12,557,947.29 in compensatory damages awarded against Dr. Beauchaine and OHIC, $1 million, or 7.963% of the total compensatory damages awarded against these defendants, was paid by OHIC under the Primary Policy. The remainder of the compensatory damages was paid by OHIC under the Umbrella Policy. According to OHIC, $533,532.14, or 7.963% of $6,700,068.50, of the prejudgment interest imposed pursuant to § 807.01(4) was paid under the Primary Policy, and the remainder of the prejudgment interest, or $6,166,536.36 ($6,700,068.50 less $533,532.14), was paid under the reinsured Umbrella Policy.

ERC argues that the imposed prejudgment interest is covered, in its entirety, by the Primary Policy. More particularly, ERC argues that all of the § 807.01(4) interest imposed is covered under the Supplementary Payments provision requiring OHIC to pay "all expenses incurred by the company" and "all interest on the entire amount of any judgment therein which accrues after entry of the judgment[.]" The court will address these two clauses separately.

The court is not persuaded that the clause requiring OHIC to pay "all expenses incurred by the company" covers the prejudgment interest imposed in the Hegarty case. ERC contends that because OHIC itself was directly liable for the § 807.01(4) interest in the Hegarty case, this interest should be treated as OHIC's "expense." Following this logic, the Primary Policy provides that OHIC agreed to pay "all expenses" that it incurred, without any limitation, and therefore agreed to pay all of the § 807.01(4) interest, including all prejudgment interest imposed under the statute.

ERC's construction of the Supplementary Payments provision of the Primary Policy, as it relates to the "all expenses" clause, largely ignores the existence of the policy's endorsement that specifically addresses prejudgment interest. The Primary Policy treats "expenses" and "interest" as separate concepts for the purpose of the Supplementary Payments provision, and the policy defines OHIC's obligation to pay interest, whether it be prejudgment or postjudgment interest. Although OHIC, like the insured, was directly liable for all of the prejudgment interest imposed on the damages attributable to the insured, the Primary Policy limits OHIC's obligation regarding prejudgment interest awarded against the insured "on that part of the judgment the Company [OHIC] pays." To find that OHIC's own obligation to pay the prejudgment interest requires it to pay all of the prejudgment interest under the "all expenses incurred by the company" clause would effectively circumvent the language of the agreement defining OHIC's obligation as it relates to the payment of prejudgment interest. Thus, the fact that OHIC was directly liable for all of the prejudgment interest does not somehow transform the interest imposed into an expense for the purpose of the Primary Policy.

The court will next address coverage of prejudgment interest under the "all interest on the entire amount of any judgment therein which accrues after entry of the judgment" clause. ERC argues that the term "accrues" as used in this clause means when the amount becomes due and payable, or vested, or comes into force or existence. So construed, the provision addresses prejudgment and postjudgment interest that becomes due and payable after entry of the judgment, and would require the payment of all prejudgment interest calculated on the entire amount of the judgment.

The court again notes that the Primary Policy contains an endorsement to the Supplementary Payments provision that specifically addresses prejudgment interest. To find that the unamended part addresses both prejudgment and postjudgment interest would effectively render as superfluous the amendment to the provision. Moreover, ERC's definition of the word "accrues" is not consistent with the word's use in context. According to Black's Law Dictionary (8th ed. 2004), the verb "accrue" means "to arise" or "to accumulate periodically." Similarly, the Oxford English Dictionary (2d ed. 1989), defines this word to mean "to arise" or "to accumulate." As to the accrual of interest, the contract provision has a temporal component that begins with the entry of judgment and ends with payment on the judgment. When read in context, it is clear that the word "accrues," as used in the Supplementary Payments provision, means "accumulates," and not "arises" as suggested by ERC.

Therefore, the court resolves that the extent of OHIC's obligation, under the Primary Policy, to pay the prejudgment interest portion of the interest imposed under § 807.01(4) is governed by the prejudgment interest endorsement. Thus, the court

must turn to this language of the Primary Policy to determine whether OHIC agreed to pay interest beyond that calculated on the portion of the compensatory damages paid by this policy.

> b. Prejudgment Interest Endorsement to Supplementary Payments Provision

The prejudgment interest endorsement amending the Primary Policy states in part that OHIC will pay, "in addition to the applicable limit of liability, prejudgment interest awarded against the insured on that part of the judgment the Company [OHIC] pays." According to OHIC, this language demonstrates an intent that the Primary Policy only cover prejudgment interest that accrues on the part of the judgment paid under the Primary Policy. ERC argues that OHIC's obligation to pay interest under the prejudgment interest endorsement is not limited to the amount of the interest that accrues on the amount of the judgment paid pursuant to the Primary Policy. In this regard, ERC correctly notes that the endorsement does not state that OHIC will pay "prejudgment interest awarded against the insured on that part of the judgment the Company [OHIC] pays *pursuant to the Primary Policy*." (Italicized portion added.) ERC argues that, without this additional language, the policy requires OHIC to pay prejudgment interest on the part of the judgment OHIC pays in any capacity, including as the excess insurer.

The court resolves that the Primary Policy only provides coverage for the prejudgment interest calculated on the portion of the verdict paid by the Primary Policy. The prejudgment interest endorsement does not expressly state whether it applies only to the part of the damages award OHIC pays "only in its capacity as the

primary insurer," or "in any capacity." But, by its terms, the language of the endorsement only amends the Primary Policy. The language of the endorsement is necessarily in reference to the policy it amends, and thus contains the implicit intent that OHIC pay this interest in its capacity as the primary insurer. Furthermore, the endorsement contains no reference to any other policy which could require OHIC to pay part of a judgment not covered under the Primary Policy. In the absence of any reference to any other policy of insurance, and viewing the language of the endorsement in context, the court resolves that this language can only be reasonably construed to refer to OHIC's payment of prejudgment interest in its capacity as the primary insurer. Therefore, the court concludes that the Primary Policy only covers the prejudgment interest calculated on the portion of the verdict covered by the Primary Policy.

> iv. Coverage of Prejudgment Interest Under Umbrella Policy

Because the Primary Policy does not cover all of the prejudgment interest imposed under § 807.01(4), the issue becomes whether the Umbrella Policy covers the prejudgment interest not covered by the Primary Policy. OHIC argues that the payment of the prejudgment interest at issue here constitutes "[u]ltimate net loss," which is covered under the Umbrella Policy. ERC argues that the Umbrella Policy expressly excludes coverage for prejudgment interest imposed under § 807.01(4), pursuant to the provision that states that the policy "does not apply to defense, investigation, settlement or legal expenses covered by underlying insurance[.]" Alternatively, ERC argues that the Umbrella Policy excludes

coverage for prejudgment interest imposed under § 807.01(4), pursuant to its exclusion of "interest on any judgment of [sic] award" from its definition of "ultimate net loss." OHIC argues that these exclusions do not apply, and even if one does apply, it is inconsequential because OHIC could not, as a matter of law, contract around providing coverage for the prejudgment interest at issue.

### a. Coverage of Prejudgment Interest as "Ultimate Net Loss"

Under the Umbrella Policy, OHIC agreed "[t]o indemnify the insured for ultimate net loss in excess of the retained limit which the insured shall become legally obligated to pay as damages because of personal injury . . . caused by an occurrence." As pertinent here, the policy defines "ultimate net loss" to mean "the sum actually paid or payable in cash in . . . satisfaction of any claim or suit for which the insured is liable . . . by adjudication . . . but excludes all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment of [sic] award)[.]" The prejudgment interest at issue became due as a result of the _Hegarty_ defendants' adjudicated liability in regard to the insured defendant's negligence. Therefore, without considering the exclusions alleged by ERC, the general definition of "ultimate net loss" includes the prejudgment interest paid in the _Hegarty_ case. Consequently, the issue resolves to whether either exclusion as alleged by ERC applies.

### b. Applicability of Umbrella Policy Supplementary Payments Exclusion

27

The Umbrella Policy contains a provision stating that "[w]ith respect to any occurrence to which underlying insurance does apply: (a) this policy does not apply to defense, investigation, settlement or legal expenses covered by underlying insurance[.]" The court is not persuaded that the prejudgment interest at issue is subject to this exclusion. First, as determined above, the prejudgment interest at issue is not covered by the underlying insurance, i.e., the Primary Policy. Second, the prejudgment interest at issue simply cannot be characterized as defense, investigation, settlement or legal expenses. The statutory interest was imposed by a Wisconsin court due to the rejection of a settlement offer which was less than the judgment recovered. Therefore, this exception does not apply here to bar coverage of the prejudgment interest at issue.

        c.    Applicability of Exclusion of "Loss Expenses and Legal Expenses" from Definition of "Ultimate Net Loss"

The definition of ultimate net loss excludes "all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment of [sic] award)[.]" ERC argues that the prejudgment interest imposed constitutes "interest on any judgment" and is therefore excluded from the definition of ultimate net loss.

The definition of ultimate net loss contained in the Umbrella Policy does not expressly distinguish between prejudgment and postjudgment interest like the Primary Policy, and the "interest on any judgment of [sic] award" language of the Umbrella Policy does not contain the same temporal qualifier found in the Primary Policy

28

(which covers "all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company" has paid the judgment). Moreover, the exclusion contained in the definition of ultimate net loss is broad – the definition excludes "all loss expenses and legal expenses," which include, but are not limited to, attorneys' fees, court costs and interest "on any judgment of [sic] award."

But the use of the words "on any judgment" reasonably indicates an intent to only exclude, from the definition of ultimate net loss, interest that accumulates after the judgment is entered. While postjudgment interest begins to accumulate only after judgment is entered, prejudgment interest is calculable when judgment is entered and therefore typically forms part of the judgment. And as applied here, the prejudgment interest portion of the imposed statutory interest was not imposed on the judgment. When the judgment was entered in the <u>Hegarty</u> case, the amount of prejudgment interest was calculated on the amount recovered, i.e., the verdict, and this amount formed part of the court's judgment. Therefore, the prejudgment interest imposed in the <u>Hegarty</u> case does not constitute "interest on any judgment," and thus is not excluded from the definition of ultimate net loss.[9]

---

[9] Even assuming arguendo that one of these exceptions applies, OHIC still would be liable for the portion of the prejudgment interest imposed under § 807.01(4) not covered under the Primary Policy, because of its contractual relationship with the insured under the Umbrella Policy. That is, OHIC could not free itself, by contract, of its obligation to pay interest under § 807.01(4) accruing on the portion of the verdict for which it was contractually responsible as the excess insurer. <u>See</u> Wis. Stat. § 632.24 (Wisconsin's "direct liability" statute); <u>Nelson v. McLaughlin</u>, 565 N.W.2d 123 (Wis. 1997)(holding that insurer was liable for interest imposed under § 807.01(4) only on the amount of the verdict for which it was responsible, which was the policy

For these reasons, the court concludes that the Umbrella Policy covers the prejudgment interest imposed under § 807.01(4) calculated on the amount of compensatory damages covered by said policy. Having reached this conclusion, the issue becomes whether OHIC's payment of the prejudgment interest at issue is covered as a "loss" under the Reinsurance Agreement.

      v.    Coverage of Prejudgment Interest Under Reinsurance Agreement

Pursuant to Article III of the Reinsurance Agreement, ERC agreed to indemnify OHIC for 100% of the "loss sustained by" it under the Umbrella Policy, subject to a $25,000,000 limit. Article IV defines "loss" to include "amounts . . . within the applicable policy limits . . . paid by the REINSURED [OHIC] . . . in satisfaction of awards or judgments (including prejudgment interest and plaintiff's costs included in the judgment and subject with the judgment to the applicable policy limit)[.]" Under the Reinsurance Agreement, "loss" does not include "claim expenses," which is defined separately. Article IV defines "claim expenses" to mean "all payments under the supplementary payments provisions of the REINSURED'S [OHIC's] policy, including court costs, interest upon judgments, and allocated investigation, adjustment, and legal expenses." Thus, the definitions of "loss" and "claim expenses," for the purpose of the Reinsurance Agreement, distinguish between

---

limits, absent contractual language obligating the insurer to pay interest imposed under this statute on damages above its policy limits); and <u>Knoche</u>, <u>supra</u> (noting that, in view of § 632.24, the insurer's obligation to pay interest under § 807.01(4) is not limited by its contract with the insured, and thus it cannot, by contract, "free itself from the application of" § 807.01(4)).

prejudgment interest and postjudgment interest, and prejudgment interest is specifically included in the definition of loss.

Despite the reference to prejudgment interest in the definition of loss, ERC seems to argue that the prejudgment interest imposed here under § 807.01(4) is not covered because OHIC was directly liable for payment of the interest. In this regard, ERC asserts that the "within applicable policy limits" language of the definition of "loss" indicates an intent to only cover payments under applicable insurance policies. ERC views the definition of loss as only covering OHIC's payments made on behalf of its insured pursuant to its policy obligations and not sums for which it is directly liable.

In <u>Hegarty</u>, the trial court entered judgment in favor of the plaintiffs and against Dr. Beauchaine and OHIC, jointly and severally. Thus, ERC is correct that OHIC was directly liable for the entirety of the interest imposed under § 807.01(4), including the interest imposed on the time period between the date of the settlement offers and the date judgment was entered. But the fact that OHIC was directly liable for the statutory interest, including the prejudgment interest, does not change the fact that its liability to pay prejudgment interest arose due to its agreements covering the insured's liability. In fact, as discussed above, OHIC agreed to cover prejudgment interest under both the Primary and Umbrella Policies. Hence, OHIC's obligation to pay the interest was not independent of the Umbrella Policy (or the Primary Policy). Without the existence of the Umbrella Policy, OHIC would have no obligation to pay the statutory interest beyond that covered by the Primary Policy. <u>See</u> <u>Nelson</u> (holding that the insurer was only liable for interest imposed under § 807.01(4) on

that amount of the verdict which it was responsible, which was the policy limit).

Based on the foregoing, the court concludes that OHIC's payment of the prejudgment interest imposed under § 807.01(4), calculated on the portion of the verdict covered by the Umbrella Policy, constitutes a "loss" under the Reinsurance Agreement. Accordingly, the court further concludes that ERC is obligated to reimburse OHIC as to this loss pursuant to the terms of the Reinsurance Agreement.

     E.    Postjudgment Interest and Legal Expenses

        i.    Summary of Arguments

OHIC argues that it is entitled to reimbursement from ERC, under the terms of the Reinsurance Agreement, for a portion of the (1) postjudgment interest imposed in the Hegarty case and (2) the attorney and expert witness fees ("legal expenses") it incurred in the defense of the lawsuit. OHIC contends that ERC should indemnify it for these "claim expenses" in the proportion that ERC reimbursed its loss under the Umbrella Policy. Specifically, OHIC argues that ERC agreed to reimburse it for a pro rata share of claim expenses paid by the otherwise unreinsured Primary Policy based on the ratio of loss paid under the reinsured Umbrella Policy to the total amount of loss. OHIC asserts that it incurred nearly $2 million in legal expenses in connection with the Hegarty litigation, and also incurred nearly $3 million in postjudgment interest during the Hegarty appeal. Applying the ratio described above, OHIC argues that ERC should have reimbursed it a total of $4,545,540.85. ERC argues that OHIC is not entitled to reimbursement for any payments made under the Primary Policy.

ii.  Relevant Policy Language

"ARTICLE V" of the Reinsurance Agreement is the basis of OHIC's claim for reimbursement of postjudgment interest and legal expenses.  This article of the agreement provides in part as follows:

> INDEMNITY FOR CLAIM EXPENSES.  The Corporation [ERC] hereby agrees that, as respects reinsurance afforded by the other terms of this agreement, the CORPORATION will, with respect to each claim, indemnify the REINSURED [OHIC] against that proportion of claim expenses paid by the REINSURED that the amount of loss ultimately borne by the CORPORATION bears to the total amount of loss[.]

(Doc. 39-6, p. 5.)

As noted above, the term "claim expenses," as defined in relevant part by Article IV of the Reinsurance Agreement, means:

> all payments under the supplementary payments provisions of the REINSURED'S policy, including court costs, interest upon judgments, and allocated investigation, adjustment, and legal expenses.

(Doc. 39-6, p. 4.)


iii. Discussion

OHIC argues that the phrase "all payments under the supplementary payments provisions of the REINSURED'S policy" in the definition of claim expenses refers to the supplementary payments provisions of the Primary Policy and the Umbrella Policy, not just the Umbrella Policy.  Additionally, OHIC argues that other language of the Reinsurance Agreement, as well as the parties' course of dealing and performance, support its position that the postjudgment interest and legal expenses are covered under the Reinsurance Agreement.

ERC argues that it is only obligated to reimburse OHIC for

claim expenses paid under policies that ERC reinsured. OHIC concedes that the legal expenses and postjudgment interest were paid under the Supplementary Payments provision of the Primary Policy, and not the Supplementary Payments provision of the Umbrella Policy. OHIC also concedes that, after January 1, 1994, OHIC elected to stop ceding any of the loss under its primary policies to ERC. Because the postjudgment interest and legal expenses were paid under the Primary Policy, ERC contends that OHIC is not entitled to reimbursement for these payments.

In view of these arguments, the issue resolves to whether, under the Reinsurance Agreement, ERC must indemnify OHIC for its payment of postjudgment interest and legal expenses in the proportion that ERC reimburses loss under the Reinsurance Agreement, even though the postjudgment interest and legal expenses were paid under the Primary Policy.

A relatively recent decision of the United States District Court for the Western District of Oklahoma, supports ERC's position on this issue. In <u>Oklahoma ex rel. Holland v. Employers Reinsurance Corp.</u>, No. 06-0426, 2007 WL 2703157 (W.D. Okla. Sept. 13, 2007), the court was confronted with an issue substantially similar to the "claim expenses" issue presented before this court. In that case, the Insurance Commissioner for the State of Oklahoma, acting as the court-appointed receiver of Hospital Casualty Company ("HCC"), brought suit against ERC, contending that HCC was entitled to recover from ERC in connection with claims under reinsurance policies issued by ERC. HCC had issued primary and excess general liability insurance policies to a nursing home business, and ERC reinsured the excess policies via three reinsurance certificates containing identical language as it pertained to the issue before

34

the court.[10]  The receiver sought reimbursement for HCC's defense costs, or "claim expenses," incurred in connection with claims against the insured nursing home business.  The reinsurance agreement between ERC and HCC specified that the agreement applied to a commercial excess-umbrella policy, which was identified by the agreement as the "Reinsured Policy."  The agreement did not apply to the primary policies which HCC had issued to the nursing home business.

The agreement between ERC and HCC provided that ERC would indemnify "the Reinsured" against loss up to 100% of the umbrella policy limit.  Id.  The term "loss" did not include "claim expenses," the reimbursement of which was governed by another provision, which provided in part that ERC " 'hereby agrees that, *as respects reinsurance afforded by the other terms of this certificate*,' . . . ERC will indemnify the Reinsured for its proportionate share of claim expenses." (Emphasis added by Oklahoma ex rel. Holland court) Id. at *8 (quoting underlying agreement). The Oklahoma ex rel. Holland court viewed this provision as demonstrating ERC's agreement to "pay HCC for claim expenses it incurs in conjunction with the excess policy that ERC is reinsuring." Id.  The court further explained: "As the certificate designates the underlying excess-umbrella policy as the 'Reinsured Policy,' any references to the 'Reinsured' are obviously intended to mean HCC in the capacity in which it is reinsured, as the excess carrier." Id.  The court recognized that the policy might have been clearer if the definition section had limited the term "claim

---

[10] For the purpose of simplicity, this court, like the Oklahoma ex rel. Holland court, will refer to these reinsurance policies in the singular.

expenses to those paid under the excess-umbrella policy." Id. But the court resolved that it was "evident from other provisions in the reinsurance agreement that ERC did not agree to pay for its pro rata share of the expenses HCC paid under the primary policy." Id.

Although they contain much of the same language, the reinsurance agreement at issue in the Oklahoma ex rel. Holland case was not identical to the reinsurance agreement at issue here. For example, in Oklahoma ex rel. Holland, the agreement applied to one umbrella policy, which was identified as the "Reinsured Policy." In the case at bar, the Reinsurance Agreement's "APPLICATION OF AGREEMENT" provision provides that it applies to certain coverages under "the REINSURED'S excess liability policies" that became effective between January 1, 1994, and January 1, 1998. Additionally, the term "claim expenses" was defined in the agreement in the Oklahoma ex rel. Holland case to "mean court costs, interest upon judgments and allocated investigation, adjustment and legal expenses." Here, "claim expenses" is defined as "all payments under the supplementary payments provisions of the REINSURED'S policy, including court costs, interest upon judgments, and allocated investigation, adjustment, and legal expenses." While there are subtle differences between the reinsurance agreement in the Oklahoma ex rel. Holland case, and the Reinsurance Agreement between OHIC and ERC, the reasoning applied in that case is instructive.

Under the "APPLICATION OF AGREEMENT" provision of the Reinsurance Agreement (Article I), the agreement applies to hospital professional liability coverage under certain excess liability policies of OHIC. The Umbrella Policy fits squarely within this provision, while the Primary Policy does not. Nothing

in the "application of agreement" provision suggests that the agreement applies, in any way, to any of OHIC's primary policies. This language is consistent with OHIC's general concession that it did not cede any loss under its Primary Policy to ERC. (Doc. 41.)

Additional language in the Reinsurance Agreement supports a finding that OHIC is not entitled to reimbursement for legal expenses and postjudgment interest paid under the Primary Policy. Like the reinsurance agreement in <u>Oklahoma ex rel. Holland</u>, the Reinsurance Agreement contains separate indemnification provisions as to "loss" and "claim expenses," which, when read together, indicate an intent that ERC only indemnify OHIC for "claim expenses" it incurs in its role as an excess insurer. Pursuant to Article III of the Reinsurance Agreement, "[a]s respects loss sustained by the REINSURED under such [excess] policies," ERC agreed to indemnify "the REINSURED" against 100% of such "loss" subject to the specified limits. Article V of the Reinsurance Agreement provides that "as respects reinsurance afforded by the other terms of this agreement," ERC will indemnify "the REINSURED against that proportion of claim expenses paid by the REINSURED that the amount of loss ultimately borne by the CORPORATION bears to the total amount of loss[.]" By referring to "reinsurance afforded by the other terms of this agreement," the provision addressing indemnification for claim expenses in effect references the reinsurance provided under Article III, which concerns "loss sustained by the REINSURED" under the excess policies described in Article I. Therefore, the Reinsurance Agreement unambiguously demonstrates an intent that OHIC would only be indemnified for "claim expenses" incurred in its capacity as an excess insurer.

OHIC argues that limiting the "indemnity for claim expenses"

37

provision in the Reinsurance Agreement to claim expenses paid under excess policies would render certain language superfluous or nonsensical. Specifically, OHIC contends that, pursuant to ERC's interpretation of Article V, it was unnecessary to include language providing that ERC will pay claim expenses in proportion to the amount of loss it pays because ERC pays 100% of the loss paid by the reinsured excess or umbrella policy. But, as ERC notes, ERC does not provide 100% reinsurance for all excess policies covered under the Reinsurance Agreement. The Reinsurance Agreement specifically addresses circumstances in which OHIC provides excess coverage above the insured's self-insured retention. In those circumstances, Article III of the Reinsurance Agreement provides that ERC only covers 10% of the first $1 million of OHIC's loss. Thus, when a portion of the liability is self-insured, ERC would not reinsure 100% of the loss borne by OHIC. The terms of Article V ensure that ERC only indemnifies OHIC for claim expenses in the proportion that ERC reinsures OHIC's total loss. Therefore, contrary to OHIC's argument, the finding that Article V only addresses claim expenses paid by OHIC in its capacity as the excess insurer, does not render language of the agreement superfluous or nonsensical.

OHIC also argues that the term "REINSURED" should not be limited to OHIC, in its capacity as an excess or umbrella insurer, in view of language in Article IX of the Reinsurance Agreement concerning ERC's right to jointly participate with the "REINSURED" in the investigation, adjustment, or defense of claims. The pertinent language of this provision states that ERC "shall have the right, at its own expense, to participate jointly with the REINSURED in the investigation, adjustment or defense of claims to

which, in the judgment of the [ERC], it is or might become exposed." OHIC argues that, under the limited construction of the term "REINSURED" advocated by ERC, ERC only has the right to participate jointly in the defense of a claim if the reinsured is defending the claim in its capacity as an excess insurer. Even so, OHIC, in its capacity as the excess insurer, and ERC, as the reinsurer of the Umbrella Policy, obviously had interest in the <u>Hegarty</u> litigation insofar as damages potentially exceeded the Primary Policy limits. The court does not read this provision to suggest a construction of the term "REINSURED" to include OHIC, acting in any capacity, throughout the Reinsurance Agreement. Therefore, the court resolves that the language in Article IX regarding ERC's rights to joint participation does not preclude a finding that OHIC is clearly not entitled, under Article V of the Reinsurance Agreement, to indemnification for legal expenses and postjudgment interest paid under the Primary Policy.

Finally, OHIC argues that for more than 20 years, and as to twenty claims, ERC has interpreted the language at issue here as requiring it to pay a pro-rata share of claim expenses based on the formula described by OHIC. In essence, OHIC asserts that extrinsic evidence of this course of dealing and performance demonstrates the intention of the parties, at the time of entering the Reinsurance Agreement, that ERC would indemnify OHIC for a portion of the legal expenses and postjudgment interest paid under the Primary Policy.

While evidence of course of dealing and performance might illuminate or clarify the intent of contracting parties when a contract is ambiguous on a particular point, if the contractual language at issue is not ambiguous, reference to this evidence is unnecessary, and inappropriate, to ascertain the parties' intent.

Contrary to OHIC's suggestion, review of extrinsic evidence is unnecessary in this case to assist the court in determining whether at least two reasonable interpretations of the pertinent contractual language exist so as to demonstrate an ambiguity. The court has reviewed the pertinent insurance contracts and, while recognizing that the coverage issues presented are complicated, finds no ambiguity of consequence in the contracts as to these issues. Therefore, it would be improper to consider extrinsic evidence allegedly demonstrating the parties' intent as it relates to a particular issue. See e.g. Schachner, supra. Accordingly, OHIC's reliance upon evidence concerning the parties' course of dealing and performance, in an attempt to demonstrate the parties' intent, is unavailing.

Based on the foregoing, the court concludes that OHIC is not entitled to indemnification for a portion of the legal expenses and postjudgment interest it incurred in connection with the Hegarty lawsuit. Accordingly, ERC is entitled to judgment as a matter of law on this issue.

V. Conclusion

For the reasons set forth herein, OHIC's motion for partial summary judgment on indemnification for prejudgment interest (doc. 40) is GRANTED. OHIC's motion for partial summary judgment on indemnification for legal expenses and postjudgment interest (doc. 41) is DENIED. ERC's motion for summary judgment (doc. 39) is DENIED insofar as it relates to OHIC's claim for reimbursement of the prejudgment interest at issue, and GRANTED insofar as it relates to OHIC's claim for reimbursement for legal expenses and postjudgment interest. Additionally, the court GRANTS OHIC's

40

motion to exclude the testimony of ERC's expert (doc. 31), and GRANTS ERC's request to exclude any opinion of OHIC's expert, Mr. Crawford, regarding the proper interpretation of Wis. Stat. § 807.01. Lastly, having shown good cause for filing additional memoranda as required under S.D. Ohio Civ. R. 7.2(a), ERC's motion for leave to file sur-reply briefs (doc. 52) is GRANTED. Thus, the court reviewed these briefs as part of its full consideration of the issues presented.

It is so ORDERED.

                                    s/ James L. Graham
                                    JAMES L. GRAHAM
                                    United States District Judge


DATE: March 8, 2010